Good morning, Your Honors, and may it please the Court. My name is Alexandra Howell with the Upper Midwest Law Center, on behalf of Plaintiff Appellant Tony Schmitt, who is in the courtroom with us today. I'd like to reserve four minutes for rebuttal. We're here today because appellees canceled Tony Schmitt's QUEST program after declaring that his biblical lens is a lens of discrimination, exclusivity, gender biases, and stereotypes. There is no precedent that allows government, even when running a prison, to be so blatantly non-neutral in its treatment of religious speech and exercise. Appellee's departure from neutrality was far from subtle. They engaged in egregious viewpoint discrimination based on religious animus. Before I delve in further, I welcome this Court's questions. If the Court does not have any immediate questions, I'd like to briefly address the standard of review for this preliminary injunction. In a First Amendment case, the preliminary injunction factors collapse into a single inquiry, the likelihood of success on the merits. As the Supreme Court explained in Gonzales v. O. Centro, the burdens here track the burden debt trial, and appellant has met his easily. Just like the baker in Masterpiece Cakeshop, Tony Schmitt has a First Amendment right to the neutral and tolerant treatment of his religious beliefs. Appellee's decision to cancel the premier religious program at the Minnesota Correctional Facility in St. Cloud based on its problematic biblical viewpoint was anything but. Does that argument, is that based on Turner not applying? Your Honor, appellant meets his burden on whether or not Turner applies, and that really comes down to neutrality. Neutrality is really at the heart of this case, and so strict scrutiny applies because there was non-neutral targeting of religious exercise, and for the same reason, Turner cannot apply because Turner always requires neutrality. So you're saying Turner does not apply? That's correct, Your Honor. So it seems to me that we're talking about, we're so early in this case at a preliminary injunction, there's not a lot of fact record, but can you help me understand, and maybe the opposing counsel can too, is the difference between the prison's DOC programming, the programming, and then their provisions for spiritual care. Now I understand that your client's program was under this Department of Corrections programming. Is that right? Yes. It's not under spiritual care. Your Honor, there isn't a difference in the record. All right. Is how I would answer that. So the record shows that he applied to have this program within the prison, went through with this procedure, correct? The record shows that Tony Schmidt contacted, who was then the chaplain of the facility, Bill Dornbusch, who oversaw religious programming within MCF in that facility. And then it was, so the quest was originally brought in through the chaplain who oversaw religious programming, and Dornbusch described it as the most popular and premier religious program. Well, and so what you're saying is when you look at the policies that are attached to the declaration on behalf of the prison, it seems like there's different policies for programming and there's different policies for spiritual care. And I'm just trying to get a sense of where your client's quest program falls. Your Honor, I think the prison does have some distinct policies for spiritual care. Those seem more to be internal policies about what sort of religious materials can inmates possess and go maybe more towards the day-to-day activities. So the program is not, in your view, under the spiritual care programming? Your Honor, I think it falls under the general volunteer services program. And that, I mean, it is a religious program, and so some of the religious parts may apply. But what I think maybe the fundamental problem I see with Apelli's argument of kind of trying to splice these a little bit is that there's really no clear distinction in the policies of, you know, this program is in Camp A, this program is in Camp B. What we have is a pretty broad forum of... Well, isn't the argument essentially that if it's in this government programming for rehabilitation, that somehow they have more control over what is able to be expressed to prisoners because of the implications that the government's responsible for it? That may be an argument that Apelli's could have made, Your Honor. I don't really see that argument in the record. Maybe I'm misunderstanding my colleague, but isn't that kind of the government speech angle on it, that this is government speech? And I understand you think that that may have been waived or something like that, but I guess I understand that to be part of the government speech argument. I understand that, Your Honor, and there is a part of the government speech argument is these are rehabilitative programs. And what is in the record is that there are programs, and some of these programs are listed as prayer services, Bible studies, various faith traditions, worship, and on the same list in the same type of programs are rehabilitative programs. And the volunteer services policy document just states that volunteers provide programming. It doesn't say volunteers provide this type of programming or a different type of programming. And so to the extent that Apelli's are now trying to make an argument that there's a separate forum within the prison that is somehow more tightly controlled by the government, that just doesn't reflect what is in the record. Well, what about the part of what's in the record is sort of what started this whole issue, and that is sort of an evaluation of this program. And as I read that evaluation, it was assessing its success in dealing with the rehabilitative ideas and evidence-based programming, and it was actually assessing inclusivity and how do they deal with discussions among the inmates. So is that kind of an assessment also done for a spiritual care program? I'm using whatever I've got in this small record to sort of figure out where this program lands, and that seems to me to be a feature that lends itself to the belief that it's part of, as Judge Smith kind of described, a rehabilitative program. And maybe I'm way off, but I'm trying to piece this together as best I can at this preliminary stage. I understand the question. I don't know exactly why the review took place in 2018. There isn't anything in the record to explain why Mr. Sutter decided to review the QUEST program that day or what sent him at that purpose. What we do know from the record is that QUEST, in 2012, it was brought in as a religious program under the authority of the chaplain. What we know from the Dornbush Declaration Exhibit A, which is on the Joint Appendix at page 102, is that there are a number, or in August 2023, right after QUEST was canceled, there were a number of different volunteer-based programs that allowed offenders to practice their faith under the facilitation of a volunteer. And those included, like, a DOC mentorship program, a prison fellowship reentry program. Those programs sound and look more like rehabilitation, and they're on the same list as prayer, worship. And they're religion-based? Are they identified with a particular religious denomination? The prison fellowship is delegated as Christian. I did not see a religious delegation with the mentorship program. Also, in evidence submitted in the Robertus Declaration, the Joint Appendix, page 136, there's a schedule of Christian programs, just the Christian ones. Appellees did not provide a schedule of all the different programs, but even the small schedule they provided, again, shows worship, prayer, Bible study, and a life skills class, which sounds more like rehabilitation, all on the same list. And so there's nothing in the record to differentiate or distinguish between the two in the way appellees may want to do for the government speech doctrine. And I think that also can go towards the government speech factors, in that the public perception is we have various programs and classes being hosted within the prison, and they're all being published on the same list and schedule. And so there's no way for inmates or other members of the public to really see a difference. If, just for these purposes, I understand that your view is that Turner does not apply. But if it does, do you think that there is a rational relationship to a penological interest in what the DOC has expressed here? No, Your Honor. I think that this Court's Sisney decision makes clear that the prison's interest needs to be rational and neutral. As we've explained in our briefs, we are far afield from neutral in this case. But to answer your question specifically on rationality, this Court in Sisney also made clear that if it's not obvious by common sense of why this item needed to be removed for the prison or— But Sisney was more of a—that wasn't that—that was publications and books that were coming to individual inmates, sort of their individual receipt, whereas this is sort of a group, well, rehabilitation. And what they're saying is it's against—it is contrary to our rehabilitative mission by creating problems for particular inmate populations. And they have a little bit more specific. Do you think that's enough, or why isn't that enough? That's not enough for the same reasons it wasn't enough in Sisney, even though there, obviously, we're talking about books coming in, which are—is different. I actually think that the justification for trying to keep out books or paper material may be more severe than just the ideas themselves and the discussion of ideas in a group context. And that really goes to this Court's Murchison decision, where it was an edition of Newsweek that was kept out because there were gory, violent, bloody images in it. And the prison specifically explained it has a policy on images. This violated the policy for this reason, and these images can be physically passed around the prison and used as gang affiliation to threaten other inmates or a form of currency. Here we just have ideas are bad, and we don't have any evidence of what exactly the policy is. As the Pelley's acknowledged below, that there is no written policy. And Pelley's have also acknowledged on page 29 of the transcript that the policy changes and is not stagnant over time, but they've given no reason besides just the fact of modernization for the changes. And this Court's Sisney decision, Murchison, and Murphy all explain that the government needs evidence to support its policy and its decisions, and there isn't any here. You've argued for application of strict scrutiny. What's the best authority for that? The best authority for that, Your Honor, would be the Supreme Court's Johnson v. California decision clarifying that Turner only applies to rights that are inconsistent with proper incarceration. The right to not be targeted for unduly burdensome treatment based on your religious ideas or speech, especially as an outsider to the prison, never needs to be compromised for the sake of prison administration. But would we be extending Johnson, if we take your argument, into the religious area? I mean, Johnson, if I'm remembering, was racial classifications, was it not? That is correct, Your Honor. It isn't. It's... You're saying the principle applies equally here. Well, the principle applies equally, and I will point to at least one other court, the Tenth Circuit in the Ashaeed case that we cite in our briefs, takes Johnson for that exact point. There's a non-neutral religious regulation regarding the shaving of beards, where some inmates were given exemptions and some were not. And the Court said, Johnson makes clear that Turner doesn't apply here, and so we're going into strict scrutiny because of that. And so that invitation, it's explicit in Johnson of sort of a clarification of a step, you know, that courts need to take before even deciding if Turner applies. And I see that I'm in my rebuttal time, so if there's no further questions, we would ask this Court to reverse and direct the District Court to issue the preliminary injunction. Thank you, Michelle.  Ms. Wright. May it please the Court, my name is Corrine Wright, and I represent the Minnesota Department of Corrections Commissioner Paul Schnell and Assistant Commissioner Jolene Robertus. The Department of Corrections provides rehabilitative programming and it provides spiritual care services, and these are two different things. Was that argued to the District Court, that argument? Did you make the distinction below, in other words? I mean, there's an issue here related to government speech. It seems to me at some point, whether it was raised and preserved, and I'm confused whether the government speech is the same thing you're describing here or whether they're related and whether this argument was preserved. Which argument, Your Honor, that they're two separate things? There are two separate policies attached to the Robertus Declaration, and that was a declaration that was in the record. In other words, the argument distinguishing the two, was that presented to the District Court? Absolutely. Okay, thank you. Again, and I understand this is at the Court's top of mind, is that this case isn't about a spiritual care program, right? It's about rehabilitative programming. Rehabilitation is one of the most important parts of prison administration. Are those inextricably impossible to… It seems like there's definitely overlap. Absolutely. Or potentially so. They can definitely overlap. And maybe this will help the Court if I point to the program application that's in the record. This is a program application that was not in place when Mr. Schmidt started the program in 2012, but what Mr. Schmidt wanted to do was to extend the program to other facilities, and that's why it was reviewed in whole. All the DVDs were reviewed recently. And taking into account the program proposal and the application, this is what I think will really help guide the court here. The program proposal application, this is at ECF 221, and it's also in the appendix, Volume 2 at 149. It says the DOC is moving toward a person-centered approach throughout the department. So this is a change over time from 2012 when Mr. Schmidt first started to facilitate the program until now when Mr. Schmidt said he'd like to go ahead and see if he can expand it to another facility. We're currently reviewing all proposals for alignment with evidence-based correctional practices, person-centeredness, and transformational opportunities. And in this application, any community volunteer would be filling this out, including Mr. Schmidt now, if he wanted to again apply for the Authentic Manhood Program. There are questions like, what kind of research has shown the result of your program? What has shown to reduce future criminal behavior? What evidence supports the effectiveness of your program? If you're selecting in the drop-down peer-reviewed literature, please attach those documents. So the Department of Corrections has moved from 2012 to the present. Was that process going through here?  Did that process take place in this record, the answering of those questions? Mr. Schmidt never filled out this application. I am explaining that if he were to fill out this application to propose Authentic Manhood now to the Department of Corrections, this is the kind of rigorous evidence-based questions. Was he asked to submit this application or not? Oh, he certainly could. He wasn't not asked to. The program had been going on. And then when he came to, he did not submit this application in 2012. What I'm saying is this application... But the letter in the record from the DOC basically just says, it doesn't say you need to submit the following application. It says you're out. And there is, I think, in there a reference, isn't there, to evidence-based. But there's a lot of other words in there that aren't related to that. And that, I think, is the argument that that's problematic. There's... The letter is explaining how the Department of Corrections is evaluating volunteer programming in the present. And so they were evaluating the Authentic Manhood program using this criteria. And that's why I wanted to point you to the application. Because I think it's clear now that anyone coming in, or Mr. Schmidt, if he wanted to reapply with another program or Authentic Manhood program, these are the kinds of things that the Department of Corrections is looking for. And maybe this is a good time to ask about the policy. Because your position is that Turner does apply in this situation. Am I understanding that correctly? That's presuming that there's a constitutional right at all. Yes. Okay. All right. Because the government speech argument exactly says that it would. Yeah. So if we go directly to the Turner... What policy are we talking about here? It sort of almost feels like you kind of have to search for the policy. I don't know if you have to piece them together. I'm not really sure what policy it is that the Department of Corrections is defending here. Or if there is one that's applicable to this case. So I would say that if you're applying Turner, you're applying it to the decision to discontinue the program. But what's being relied on are a series of policies that underlie that. Because if there weren't any policies related to this, could we have... I guess the question is, could we have Turner? Well, the programming policy, which explains... So that's Exhibit 2 to the declaration. And I believe it's page 140 in the appendix. Specifically states a program as a plan of things done in order to achieve a specific result. And it goes on to define evidence-based, that these programs have to have measured outcomes, specific admission criteria. So is your position then that this particular program is in this DOC programming, that it's not a spiritual care program? And can you at least express your position on where this Quest program lands? Yes. Squarely within rehabilitative programming. Was there anything in the record about the recidivist statistics for this program? Mr. Schmidt's program? Yes. Nothing in the record. Now, I understand we have a limited record, but, you know, and discovery is ongoing. But right now, and when the decision on the preliminary injunction was made, there's nothing in the record that talks about recidivism rates, any kind of that evidence-based showing outcomes other than kind of... But there was nothing to indicate that it wasn't working, but nothing to indicate that it was. Right. I mean, I do believe there was some kind of... So you didn't have evidence that something detrimental was taking place? No evidence that something detrimental had taken place, but the department doesn't have to wait for something detrimental. In prison administration, you don't have to wait for something detrimental to happen. You can absolutely prepare. I get the change. I think I understand it to more evidence-based. But my concern or potential concern is that, you know, the DOC, the letter disapproving the program seems to go beyond that. I mean, it characterizes the program as discriminatory, offensive, I forget what else, gender biases. I mean, that's not a concern about your program doesn't show evidence of working. That seems to be your approach, your viewpoint is problematic and will not be entertained. Convince me I'm reading that wrong and it may not... why I'm reading it wrong or why it doesn't matter. It doesn't matter because it's not about Mr. Schmidt's opinions or viewpoints on those issues. Again, I do want to... But it characterizes the lens of discrimination that seems to be specifically about Mr. Schmidt's viewpoint. It's the viewpoint of the program actually, the authentic manhood program, which is Mr. Schmidt didn't kind of create this from whole cloth, right? It's a DVD program that he purchased from a man who does these kinds of programs. So you're saying if Mr. Schmidt were to go in and just not play the videos but give the speeches, it would be different? Actually, he could certainly do that or show some videos, meeting with folks one-on-one with people in the prison. Our point is that... What about a spiritual? What if, like, he were the minister that came in weekly and these were the same topics that Judge Kobus is referring to? Could he express those views in the quest for manhood church? So as a volunteer, he can actually... It's in the spiritual care policy. He can perform what's called intermittent spiritual or religious services by contacting the chaplain. Then there's a place in the policy where you see that what the chaplain would do is, like, identify whether or not that seemed to be the kind of program that inmates were interested in going to. So he's not foreclosed from discussing these types of things. He can contact the chaplain at the facility. But the note was he could come up with a different program. A different rehabilitative program, that's right. But he could take these same ideas about gender, sexuality, and the causes of criminality and discuss them on a weekly or monthly church setting within the prison. Without dodging our question, he certainly could try. So in other words, there's a place in the policy to contact the chaplain and do as a volunteer these kind of intermittent spiritual programs. And so to the extent that... I mean, there are certain things that the chaplain's going to be reviewing, including kind of incarcerated person's interest, all kinds of things, right, because you're starting to put on a program which takes time and energy. But he could certainly do that and propose it. But there wouldn't be the rehabilitative concerns on to that or... How about this? The concerns that the Department of Corrections has raised that are connected to rehabilitation, those would not be pursuant to the policies a part of the spiritual care? They're not the same concerns, Your Honor, no. They're not the same concerns. The rehabilitative programming is specifically about evidence-based rehabilitation and reduction of recidivism. I think we can all agree that spirituality and religion, like, that's not necessarily evidence-based. Those are things that we kind of feel as human beings. And so no one's going to put that kind of evidence-based requirement on somebody's spiritual care program. It's part of the rehabilitative programming. And, again, the reason I pointed everyone to that application, because I think it's really important to see that's the criteria every volunteer in the community is. They need to show the Department of Corrections that whatever their program is, is that it's going to add or enhance to the programs that the DOC is running. So it is different. It's not the same as a spiritual care program. Unless the Court has any further questions. I do have a question about the list. I think it's in your brief where, and, again, forgive me for continuing to ask. I think this is the same question in different ways. But under the programming, I think the Department of Corrections lists things that look like religious programming. And I think the opposing counsel is saying, well, look, you know, you've got Christian Bible study that you're also calling a program, and that's still ongoing. Maybe that's a fact issue that I'm still not able to get my mind around, or is it a problem? I don't think it's a problem. And I think that it goes maybe to Judge Smith's idea about the overlap. So here I'm looking at Julian Robertus' declaration, and there's kind of a list of here are some other Christian programs that are offered at the facility. And part of that is saying it's not about a biblical lens. It's not about Christianity. That is not the problem that the facility has with his authentic manhood program. Some of these programs listed are clearly like Catholic Mass. That's clearly a service. Some of the other programs, though, like the Prison Fellowship Life Skills class, that is more like a rehabilitation class. It's not that rehabilitation can't have religion entered at all. That particular program would be held up to, if it's a rehabilitative program, it has rehabilitative goals and a mission, versus I would think maybe the Rosary group is more about praying and spirituality and may have less of a rehabilitative bent to that class. This list isn't about – we're not drawing a line. Counselor, what's the effect of the entirety of this programming is voluntary or participation in it is voluntary? This isn't something that's been passed by legislature or part of a correction department program that all inmates are required to participate in. This is something being offered by someone from the outside that inmates make a personal decision to participate in. This is a great point because although they're not being required to do that particular programming, all inmates need to show proof that they've done programming during their stay in prison, and that would count toward that. If you're an inmate and you see that this program is being offered by Mr. Schmidt, you think, oh, this is a programming opportunity for me while I'm here at St. Cloud. They're not being forced to do it, but they do need to do programming in order to get their supervised release. Programming is required, not this specific program. So there's a choice there, but programming is required. Rehabilitative programming is required for all of the inmates. It's not that they're required to do this particular one, if that makes sense, Your Honor. I see my time has run, and I would just ask that the court affirm the district court's denial of the preliminary injunction. Thank you, Ms. Wright. Ms. Howell, your rebuttal. Briefly, Your Honors, I would just like to start by picking back up on this distinction between faith-based and spiritual programs. My friend on the other side just made a lot of distinctions based on these programs that are not in the record. They were based on pure speculation. This looks like rehab, but it has a little bit of religion, and none of that is in the record. Appellees could have put more in the record to clarify this distinction and chose not to. What about the argument that there's a neutral standard out there, and that standard is for rehabilitation, you need evidence-based programs, and that your program is not evidence-based, or you did not produce information or evidence in support of it. Two points on that, Your Honor. First, if there is a neutral standard out there, it was not applied to Tony Schmidt. That's apparent from the face of the July 2023 cancellation letter, that this program wasn't canceled because the appellees asked, can you submit some evidence, and Tony Schmidt said no. They decided to look at the program, were offended by Orthodox Christianity, and canceled it based on viewpoint. And secondly, the QUEST program is supported by social science research. We've submitted some. There was a published study supporting the QUEST program. We have submitted affidavits of the success of the QUEST program. Were those submitted in the district court? Yes, Your Honor. Before the district court, there's a huge amount of evidence of QUEST success. Over 1,000 inmates graduated. It was called the Premier Religious Program at MCF, and there's social science research, evidence of it operating successfully at other prisons. In comparison to all this evidence that QUEST works, there's absolutely nothing on the other side besides her viewpoint discrimination to say that it doesn't work. And I see that my time has expired, so if there are no further questions, I would ask this Court to reverse and direct the entry of a preliminary injunction. Thank you, Ms. Howell. Thank you also, Ms. Wright. The Court appreciates both counsels' participation and argument before us. We'll continue to study the record and render decisions properly as possible. Thank you. Madam Clerk, I believe that concludes our scheduled arguments for this morning. Is that correct? All right.